# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| **TARYN LORETTA COVELL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NANCY A. BERRYHILL,** | ) | **Civil Action No. 18-10184-DJC** |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                 **January 2, 2019**

## I.      Introduction

Plaintiff Taryn Loretta Covell ("Covell") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act ("SSA"), 42 U.S.C. §§ 405(g) and 1383(c)(3), Covell brings this action for judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("Commissioner"), which was issued by Administrative Law Judge Sujata Rodgers ("ALJ") on March 31, 2017, denying Covell's claim.  Before the Court are Covell's motion to reverse, D. 15, and the Commissioner's motion to affirm, D. 16.  For the reasons discussed below, the Court DENIES Covell's motion, D. 15, and ALLOWS the Commissioner's motion, D. 16.

## II.    Factual Background

Covell was 27 years old when she stopped working due to a disability that began on December 31, 2011.  R. 23, 204.  Prior to December 31, 2011, Covell had worked as a cashier for multiple companies and held various other jobs.  R. 53-54.

## III.    Procedural Background

In Covell's May 2015 application for SSDI and SSI, she claimed disabilities of depression, anxiety, asthma, respiratory problems and chronic obstructive pulmonary disease ("COPD"), R. 134, and asserted that she was unable to work as of December 31, 2011, R. 204.  After an initial review, the Social Security Administration denied Covell's claims on September 15, 2015.  R. 130. Upon reconsideration, the Social Security Administration again denied Covell's claims on January 11, 2016.  R. 143.  On February 2, 2016, Covell filed a request for a hearing before an ALJ.  D. 149.  On January 18, 2017, the ALJ held a hearing, during which Covell and Ralph Richardson, a vocational expert ("VE"), testified.  R. 20; D. 15 at 1.  In a written decision dated March 31, 2017, the ALJ determined that Covell was not disabled within the meaning of the SSA.  R. 35; D. 15 at 1.  Covell requested a review of the ALJ's decision by the Appeals Council, and after reviewing the administrative record, the Appeals Council denied Covell's request on December 4, 2017.  R. 1; D. 15 at 1.  Covell now seeks judicial review by this Court pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).  D. 15 at 1.

## IV.    Discussion

### A.    <u>Legal Standard</u>

#### 1.    *Entitlement to SSDI and SSI*

A claimant is entitled to SSDI and SSI benefits if she has a qualified "disability."  42 U.S.C. § 423(a)(1)(E).  A "disability" under the SSA is defined as an "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." Id. §§ 416(i)(1), 423(d)(1)(A); 20 C.F.R. § 404.1505(a). The disability must be sufficiently severe that it renders the claimant so physically or mentally incapable that the claimant is unable to engage in any previous work or other "substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

The Commissioner is obligated to follow a five-step sequential evaluation to determine whether a claimant is disabled and, thus, whether the application for Social Security benefits should be granted. 20 C.F.R. § 416.920(a). First, if the claimant is engaged in substantial gainful work activity, the application is denied. Id. § 416.920(a)(4)(i). Second, if the claimant does not have, or has not had, within the relevant time period, a "severe medically determinable" impairment or combination of impairments, the application will also be denied. Id. § 416.920(a)(4)(ii). Third, if the impairment meets the conditions of one of the listed impairments in the Social Security regulations, the application will be approved. Id. § 416.920(a)(4)(iii). Fourth, where the impairment does not meet the conditions of one of the listed impairments, the Commissioner determines the claimant's Residual Functional Capacity ("RFC") and assesses the claimant's past relevant work. Id. § 416.920(a)(4)(iv). If the claimant's RFC is such that she can still perform her past relevant work, her application for benefits will be denied. Id. Fifth, if the claimant, given her RFC, education, work experience and age, is unable to do any other work within the national economy, she is disabled under the SSA and, therefore, her application will be approved. Id. § 416.920(a)(4)(v).

*2.     Standard of Review*

The Court has the power to affirm, modify or reverse a decision of the Commissioner upon review of the record.  42 U.S.C. § 405(g).  Such judicial review, however, "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citing Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (per curiam)).  The ALJ's finding of fact are conclusive when supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence is "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 401 (1971), and exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion," Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

**B.     Medical History**

*1.     Covell's Hospital and Emergency Visits*

The ALJ examined extensive evidence regarding Covell's medical history, including treatment records, assessments and diagnoses.  See R. 24-33, 38-40.  The ALJ noted that Covell was admitted to the hospital multiple times from 2011-2016.

In 2011, Covell was admitted to the hospital twice for pneumonia, R. 287, 289; D. 15 at 3, and treated three other times in the emergency room ("ER") without hospital admission for pneumonia, cough, myalgia and acute bronchitis, R. 299-304; D. 15 at 4.

In January 2012, Covell was admitted to Melrose-Wakefield Hospital for three days and diagnosed with eosinophilic pneumonitis with flare-up, acute exacerbation of COPD and tobacco dependence syndrome.  R. 276.  During that hospital visit, Covell's doctor told her that smoking would exacerbate her respiratory ailments.  Id.; D. 15 at 3.  In June 2013, Covell was treated in the ER without admission for pneumonia with a history of asthma.  R. 719; D. 15 at 4.  Two months

4

later, a nurse noted that Covell had been in the hospital sometime around August 10, 2013 for pneumonia.  R. 856; D. 15 at 3.

Five months later, in January 2014, Covell was admitted to Whidden Hospital for two days and diagnosed with asthma exacerbation, anxiety and tobacco dependence.  R. 729-30; D. 15 at 3.  In March 2014, she was readmitted to Whidden Hospital for shortness of breath and cough.  R. 732.  Covell was transferred to the intensive care unit ("ICU") and diagnosed with acute hypoxemic respiratory failure and asthma.  R. 733; D. 15 at 3.  Three months later, in June 2014, Covell went to the ER for a breathing problem and was admitted to the ICU.  R. 747, D. 15 at 4.  Covell was considered "critical" upon admission and diagnosed with respiratory bronchiolitis with associated interstitial lung disease, pneumonia, asthma and tobacco use disorder.  R. 746, 761.  Covell was discharged in "good" condition.  R. 761.

Later that year, in August 2014, Covell was admitted to the ICU at Central Maine Medical Center and stayed for seventeen days.  R. 448; D. 15 at 4.  Her admission diagnosis was acute hypoxic respiratory failure with acquired respiratory distress syndrome.  R. 448.  Covell's secondary diagnoses included but were not limited to community-acquired (bacterial) pneumonia, elevated blood pressure, delirium and seizure.  Id.  Dr. Imad Durra noted that Covell had "poorly-controlled asthma," "problems with a variety of environmental allergies that can precipitate asthma attacks" and "ongoing smoking."  R. 403.  Dr. Lorky N. Libaridian wrote a progress note in October 2014 indicating that Covell's strength, breathing and cough had improved since Covell quit smoking.  R. 622.

Covell was taken to the ER in February 2015 for chest pains and coughing and she was diagnosed with shortness of breath likely caused by COPD.  R. 594, 598; D. 15 at 4.  Later that year, in September 2015, Covell was treated at Whidden Hospital for cough, fevers, chills,

myalgias and shortness of breath and was diagnosed with community acquired pneumonia and asthma exacerbation.  R. 769-73; D. 15 at 4.  In October 2016, Covell told her primary care physician ("PCP") that she had recently gone to the ER for asthma.  R. 909; D. 15 at 4.

### 2.     Treatment by Nurse Sherryl Rosen

Covell was treated by Nurse Sherryl Rosen, MS, RN, CS, ("Rosen") for anxiety and mood disorder from January 2011 to November 2016.  R. 492-572, 792-897; D. 15 at 4.  Covell went to treatment with Rosen about twice per month.  R. 29, 492-573, 792-897.  Rosen assessed Covell's mood and anxiety disorders and refilled and adjusted Covell's medications throughout her treatment.  R. 29, 492-573, 792-897.  Rosen rated Covell's Global Assessment Function ("GAF")[1] scores between a low of 53, R. 493, and a high of 62, R. 505.

Rosen reported that Covell had a nicotine dependency, R. 572, and subsequently noted that Covell had, among other things, COPD, chronic pneumonia and asthma, R. 792, 870, 874; D. 15 at 5.  In May 2011, Covell told Rosen that the nicotine patch and Chantix had not worked to stop her smoking.  R. 566; D. 15 at 5.  In September 2012, Rosen determined that Covell's mood had improved (noting only "mild depressive symptoms") and observed that Topamax had been effective in resolving Covell's mood problems.  R. 544.  During a December 2012 visit, Covell reported an increase in symptoms of depression, but the provider (filling in for Rosen) stated that it was likely related to physically being unwell and family stressors around Christmas.  R. 29, 541.  In January 2013, Covell underwent a mental status examination that showed she had adequate

---

[1] "The GAF scale provides a 'rough estimate' of a complainant's psychological, social, and occupational functioning." Bourinot v. Colvin, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (quoting Vargas v. Lambert, 159 F.3d 1161, 1164 n.2 (9th Cir. 1998) (internal quotation marks omitted)). The GAF score "simply is not raw medical data; rather, the system provides a way for a mental health professional to turn raw medical signs and symptoms into a general assessment, understandable by a lay person, of an individual's mental functioning." Gonzalez-Rodriguez v. Barnhart, 111 F. App'x 23, 25 (1st Cir. 2004) (per curiam).

grooming, cooperative behavior, normal perception, normal thoughts, intact orientation and normal memory, but also rapid speech, impaired concentration and irritable mood and affect. R. 29, 539-540. During the first half of 2013, Covell increased her intake of Abilify to control her depressive symptoms and her GAF score rose to 60. R. 29, 533-540.

In the early months of 2014, Covell told Rosen that she was smoking three to four cigarettes per day but planned to switch to vapor cigarettes and taper off nicotine. R. 841, 845; D. 15 at 5. In April 2014, Covell told Rosen that she was using an electronic cigarette, R. 839, but Rosen wrote in a June 2014 note that Covell "deals with stress by smoking cigarettes which is not good for her respiratory problems," R. 831; D. 15 at 5. In June 2014, Covell told Rosen that she was not smoking due to asthma problems. R. 861; D. 15 at 5. From late 2014 to April 2015, Covell reported to Rosen that she had almost quit smoking but still smoked occasionally when triggered by stressors. R. 811, 821; D. 15 at 6. In May 2014, Rosen assessed Covell's GAF score at 62. R. 505. By September 2014, Rosen assessed Covell's GAF score as 53. R. 493.

Around Christmas in 2015, Covell reported increased anxiety and trouble sleeping to Rosen and her GAF score was 55. R. 792. In June 2016, Rosen indicated that Covell was smoking a half-pack of cigarettes per week. R. 887; D. 15 at 6. In November 2016, Rosen conducted a mental status examination. R. 874. Rosen noted that Covell had increased her dosage of Seroquel and was cooperative with a normal mood, normal energy, normal speech and normal memory, but had impaired concentration. Id. Covell's GAF was 55. Id.

### 3.    Treatment by Dr. Robert Hallowell

Covell began seeing Dr. Robert Hallowell, a pulmonologist, in October 2014. R. 577. Dr. Hallowell opined that Covell's history of asthma and her pneumonia episodes could represent a "true infection" and a form of immunodeficiency. R. 578. He stated that, alternatively, Covell could have "some inflammatory pulmonary process." Id. In November 2014, Covell reported to

Dr. Hallowell that she could walk for thirty minutes a day without experiencing shortness of breath and that her main limitation in exercising was leg pain. R. 579. In December 2014, Dr. Hallowell saw Covell, whose main complaints were back and chest pain. R. 582. Dr. Hallowell recommended a CT of Covell's chest, an exercise regimen and a psychiatric follow-up for depression. R. 589. Covell also saw Dr. Hallowell in June 2015, when she requested a prescription for a patch to help her quit smoking again. R. 640.

### 4. State Agency Consultations

#### a) Dr. Komer's Assessment

In August 2015, the state agency physician Dr. Roger Komer, M.D., examined Covell. R. 653–55. Dr. Komer's evaluation revealed that Covell's lungs were clear. R. 654. Dr. Komer also noted that Covell "[could] walk a distance of three to four blocks" and "appear[ed] well adjusted" from a psychosocial perspective. Id. at 653-54.

#### b) Dr. Hom's Assessment

In September 2015, Covell saw Dr. Elaine Hom, M.D., who assessed Covell's physical RFC. R. 77-78. Dr. Hom found that Covell had a normal gait and breathed comfortably. R. 78. Dr. Hom noted there was "no indication" that Covell had daily pneumonia and found Covell only "partially credible." Id. Dr. Hom suggested (among other things) that Covell avoid concentrated exposure to extremes of weather, humidity, wetness and fumes due to her asthma. Id.

#### c) Dr. Kurlander's Assessment

In September 2015, Dr. Karen Kurlander, Ph.D., conducted a psychological consultative examination on Covell. R. 657–61. Covell told Dr. Kurlander that she had anxiety and depression. R. 658. Dr. Kurlander's mental status examination of Covell indicated that Covell had "vague, but . . . generally okay" long-term memory, "normal" thought processes, "fine" cognitive function, "fine" abstract thinking and the ability to complete all tasks asked of her with "relative ease[]."

R. 659.  Dr. Kurlander diagnosed Covell with moderate depression and periodic anxiety attack and a GAF score of 53.  R. 660-61.

### d)  Dr. Kellmer's Assessment

Also in September 2015, Covell underwent a psychological review with the state agency psychologist, Dr. Judith Kellmer, Ph.D.  R. 74-75, 78-80.  Dr. Kellmer concluded Covell could focus on work-related tasks for short periods on a normal schedule in a low-stress environment with a supportive supervisor.  R. 74-75, 78-80.  Dr. Kellmer reported Covell's impairments to be severe asthma, COPD, obesity and affective and anxiety disorders.  R. 75.

### e)  Dr. Fischer's Assessment

At the reconsideration level, in December 2015, Dr. S. Fischer, Psy. D., assessed Covell's mental RFC and determined Covell had no functional restrictions.  R. 109-10.  Although Dr. Fischer indicated that Covell was "moderately limited" in her ability to complete a normal workday or workweek, Dr. Fischer also noted that Covell could "carry out instructions in a normal workday/workweek."  R. 110.

### f)  Dr. McInerny's Assessment

In January 2016, the state agency physician Dr. Jane McInerny, M.D., assessed Covell's physical RFC.  R. 107-09.  Dr. McInerny concluded that Covell had some exertional and environmental limitations but could stand or sit (with normal breaks) for about six hours in an eight-hour work day.  Id.  Dr. McInerny also noted that Covell had not reported any changes for better or worse since the initial state agency assessments and that based on her review of Covell's medical records, the prior determination was "substantively correct."  R. 109.

## C.  ALJ Hearing

At the January 18, 2017 hearing, the ALJ heard testimony from Covell, who was represented by counsel, and from the VE.  R. 43.

*1.    Covell's Testimony*

Covell testified at the hearing that she was thirty-two years old and living with her parents and son in Ravine, Massachusetts.  R. 45.  "Welfare" was her only source of income.  R. 46.

Covell testified that she first contracted pneumonia for the first time at the age of twenty-one.  R. 47.  At age twenty-two, she suffered from severe pneumonia, anxiety and depression.  Id. Pneumonia was the main reason she was hospitalized while she was in school.  Id.

Covell testified that her stress-induced anxiety prevents her from doing normal activities like going to the mall or movies.  R. 50.  In addition, she explained that her immune system was "bad," and that she had asthma, which meant her "body [could not] handle" the common cold. R. 47.  Covell also testified that she had developed the first stages of COPD, which prohibits her from being in "too cold weather and too hot weather."  Id.  She also stated that, for these reasons, she had been hospitalized "once or twice a month" ten to twenty times per year.  R. 48.

In the aggregate, Covell testified that she has contracted pneumonia one hundred fifty to two hundred times since she was twenty-two years old, had a lung biopsy and seen many pulmonologists and infectious disease doctors.  Id.  Covell also testified that she has had bronchoscopies and uses a Symbicort inhaler for her COPD in the morning, as well as Ventolin when needed.  R. 48-49.  She stated that she quit smoking for a while, however, due to stress and anxiety she smokes off and on.  R. 49.  Covell testified that her soreness makes her "feel like [she is] in an 80-year-old's body, and . . . not a like physically fit and ready-to-go 80-year-old's body." Id.  Covell stated she cannot stand for any longer than "15 minutes to a half-hour, if not less." R. 50.  Covell testified that sometimes she spends the whole day in bed after she gets her son ready for school and has a cup of coffee.  R. 51-52.  On other days she cleans the kitchen, which takes several hours because she needs breaks.  R. 51.

Covell also summarized her work history. Covell testified that she began working when she was fourteen. R. 47. Covell worked for Blockbuster in 2002 and 2003 as a cashier. R. 54. She stated that her work was to check out movies to customers and check inventory, which required her to lift boxes of videos weighing between ten and fifteen pounds. R. 54-55. In 2004, she worked as a cashier for the cell phone accessory store Airport Wireless and for Family Dollar. R. 55. Covell also worked for Stop and Shop in 2008 as a part-time cashier and maintained her employment for seven months, working approximately twenty or twenty-five hours per week. R. 53-54. After her time at Stop and Shop, Covell worked for a lawyer, had a job in sales and worked as a secretary. R. 54. Her later stints of employment were interrupted by her health issues. Id.

### 2. *Vocational Expert Testimony*

During the hearing the ALJ asked the VE to "identify the jobs the claimant ha[d] performed in the past 15 years and provide the skill and exertional level of the jobs as actually performed by the claimant and is generally performed in the national economy." R. 60. The VE responded: "Ms. Covell has worked as a cashier. DOT code is 211.462-010, light work, SVP 2, unskilled." Id.

The ALJ then posed several questions to the VE regarding a hypothetical person who was of the same "age, education, and vocational background" as Covell and who could perform the same functions as Covell, including frequently lifting and carrying ten pounds and sitting, standing or walking for six hours each in an eight-hour workday. R. 61. This hypothetical person, the ALJ explained, could occasionally climb ramps and stairs, but could never climb ladders, ropes or scaffolds. Id. This individual must avoid exposure to extreme cold and heat and humidity, as well as pulmonary irritants such as dust, fumes, gas and poor ventilation. Id. The individual must avoid exposure to hazards, such as heavy machinery, moving mechanical parts and unprotected heights.

Id. Moreover, this individual is limited to the performance of simple and routine tasks, with occasional and superficial interaction with supervisors, co-workers and the general public. Id.

The ALJ first asked the VE if the hypothetical person she had described could perform any of Covell's past work. Id. The VE responded that such a hypothetical person could not do any of Covell's past work "because of the more than occasional interaction with the public." Id. The ALJ then asked the VE to opine on whether such an individual could perform other work. The VE responded that there are hand packager and mailroom clerk positions that are categorized as light work SVP 2, which is the same category in which the VE placed Covell. Id.

The ALJ then posed a second hypothetical about:

> an individual of the same[] education and vocational background as [Covell], who can sit for two hours in an eight-hour workday, and stand or walk for less than [] two hours in an eight-hour workday. This individual would be able to less than occasionally lift and carry ten pounds. This individual can never stoop or crouch or climb stairs or ladders, ropes, and scaffolds. This individual must avoid exposure to extreme [] cold, heat, humidity, as well as pulmonary irritants such as dust, gas, fumes, and poor ventilation. This individual would be absent from work more than four days per month.

R. 62. As with the first hypothetical, the ALJ asked whether "such an individual [could] perform the claimant's past work or other work." Id. The VE responded that this individual could not. Id.

### 3. ALJ Findings

The ALJ followed the prescribed five-step analysis in considering Covell's claim. See 20 C.F.R. § 404.1520(a).

First, the ALJ concluded that Covell had not engaged in substantial gainful activity since her alleged onset date of December 31, 2011. R. 23.

Second, the ALJ concluded that Covell's asthma, COPD, obesity,[2] mood disorder and anxiety constituted "severe impairments." R. 23. She identified these ailments as severe "because they cause[d] more than a minimal limitation in [Covell's] ability to perform basic work activities." Id. The ALJ also considered Covell's history of ovarian cysts, partial seizures and episcleritis of the right eye—all of which she found to be non-severe. Id. The ALJ explained that despite finding some of Covell's alleged impairments to be non-severe, she would consider all allegations of symptoms arising from severe and non-severe impairments when determining Covell's RFC. R. 24.

Third, the ALJ found that Covell did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1. Id. (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926). Regarding Covell's respiratory impairments, the ALJ considered listed impairment 3.02 (chronic respiratory disorder) and 3.03 (asthma). Id. The ALJ found that the evidence did not show that Covell met "the requisite FEV1, FVC, DLCO scores, or arterial blood gas measures under listing 3.02 or the number of attacks in spite of prescribed treatment and requiring physician intervention, occurring at least once every two months or at least six times a year as required by 3.03B." Id. Accordingly, the ALJ concluded that Covell's respiratory conditions did not meet or equal listings 3.02 or 3.03. Id.

The ALJ also determined that Covell's mental impairments did not satisfy the criteria of listings 12.04 (depressive, bipolar and related disorders) or 12.06 (anxiety and obsessive-compulsive disorders). Id. To support this judgment, the ALJ had to consider whether "paragraph

_____

[2] Although the record did not list obesity as an impairment, the ALJ, based on her review of Covell's medical history, determined Covell's obesity to be an additional a severe impairment. R. 23. The ALJ considered this determination in evaluating Covell's claim. Id.

B" criteria were satisfied. See 20 C.F.R. Part 404 App. 1 §§ 12.04(B), 12.06(B). To evaluate the paragraph B criteria, the ALJ evaluated whether Covell's mental impairments resulted in at least one "extreme limitation" or two "marked limitations" in the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace and (4) adapting or managing oneself. 20 C.F.R. Part 404 App. 1 §§ 12.04(B), 12.06(B); R. 24. The ALJ concluded that because Covell had only moderate limitations in each of the categories, the paragraph B criteria were not satisfied. R. 24-25. The ALJ also considered the "paragraph C" criteria but concluded that the record did not support a finding that Covell had only a "minimal capacity to changes in [her] environment." 20 C.F.R. Part 404 App. 1 §§ 12.04(C)(2), 12.06(C)(2); R. 25.

Fourth, the ALJ assessed Covell's RFC based on the record and concluded Covell could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds. R. 25. Covell could also sit, stand or walk for six hours each in an eight-hour workday. Id. The ALJ also concluded that Covell could occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. Id. The ALJ stated Covell could frequently balance, stoop, kneel and crouch and only occasionally crawl. Id. Covell, however, according to the ALJ, must avoid exposure to extreme cold, heat, humidity and pulmonary irritants such as dust, fumes, gas and poor ventilation. Id. She must also avoid exposure to hazards such as heavy machinery, moving mechanical parts and unprotected heights. Id. The ALJ concluded that Covell could not perform her past relevant work as a cashier based on the VE's testimony that an individual with Covell's same RFC could not meet the demands of that work. R. 33.

Fifth, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Covell could perform. R. 34. The ALJ decided that Covell would be able to perform

the requirements of a hand packer; a marker and a mail room clerk.  R. 34-35.  Accordingly, the ALJ concluded that Covell was not disabled.  R. 35.

## V.      Discussion

Covell argues that the ALJ erred in three ways.  First, Covell contends that the ALJ erred by failing to appreciate the significance of her depression and anxiety as they related to her smoking habit and resulting lung condition.  D. 15 at 3.  Second, Covell argues that the ALJ's RFC was not consistent with the state agency consultants' opinions despite the ALJ conferring "great weight" on those opinions.  Id.  Third, Covell argues that the ALJ erred by not accepting the opinion of Dr. Hallowell, Covell's treating physician.  Id.

### A.      The ALJ Properly Analyzed the Connection Between Covell's Psychologically-Driven Smoking and Her Lung Condition

Covell alleges that the ALJ erred by failing to analyze properly the connection between Covell's psychologically-driven smoking and her lung condition.  D. 10 at 15.  According to Covell, her depression and anxiety prevent her from consistently giving up smoking, which in turn exacerbates her asthma and lung condition.

#### 1.      The ALJ Made the Connection Between Covell's Smoking, Depression and Lung Condition

Covell argues that the ALJ was "more concerned with" Covell's GAF scores and mental status examinations than the relationship between Covell's smoking and her depression.  Id.  Covell also asserts that the ALJ "failed to appreciate the link between depression/anxiety, stress, smoking and [Covell's] chronic lung condition."  Id. at 11.  The Court understands Covell's argument to be primarily based on the fact that the ALJ did not cite Dr. Hallowell's notes about Covell's smoking and depression, id. at 10, and that the ALJ did not conclude that Covell's inability to stop smoking was a "marked limitation" in Covell's ability to "manage herself," id. at 11.  Although Covell devoted a fair amount of her motion documenting her healthcare providers'

belief that her depression was connected to her smoking, which in turn exacerbated her lung condition,[3] see id. at 4-6, her contention that the ALJ failed to appreciate that connection is unsupported by the record.

As a preliminary matter on this point, the Court rejects Covell's argument that the ALJ somehow erred because, Covell alleges, "[i]t is unclear whether the January 2016, note [from Dr. Hallowell] was seen by the ALJ." Id. at n.14. Covell refers to a note in which Dr. Hallowell opines: "[u]nfortunately, [Covell] continues to smoke, and I suspect that she will find it difficult to quit as long as she has ongoing issues with active depression." R. 11. Covell acknowledges that she submitted the January 2016 note to the ALJ after the hearing. D. 15 at n.10. The ALJ explained in her opinion that she accepted the evidence Covell submitted one week after the hearing but not the evidence she submitted six weeks after the hearing, because that "submission was not filed in a reasonable amount of time" and Covell's "representative did not offer any explanation pertaining to the late filing." R. 20 (citing 20 C.F.R. § 405.331(c)). Even if the ALJ did not consider Dr. Hallowell's note due to its untimely submission, the ALJ acknowledged elsewhere in her decision that Dr. Hallowell had more recently found that Covell was "incapable of even low stress work due to severe depression and anxiety." R. 32. The Court concludes, therefore, that the ALJ considered Dr. Hallowell's opinion about Covell's depression regardless of whether she considered the January 2016 note.

As to Covell's other arguments, she is correct that the ALJ noted the progression of Covell's GAF scores and mental status examinations over the course of her treatments. See R. 29-

---

[3] Covell does not explain her contention that the ALJ failed to appreciate the link between her smoking and lung conditions or what the consequence of such a failure would be. The Court, however, finds that the ALJ explicitly tied Covell's smoking to her lung condition. See, e.g., R. 27 (describing Covell's lung disease as exacerbated by smoking); R. 28 (referring to Covell's "smoking-related lung disease").

30. The ALJ highlighted that Covell's GAF scores were consistently in the moderate to mild range and that Covell had "benign mental status examinations." R. 32. The ALJ, however, also went beyond the GAF scores and examinations and considered Covell's psychological issues, which included mood disorder and anxiety disorders. R. 29. The ALJ thoroughly summarized Rosen's mental health treatments of Covell from 2011 to 2016. R. 29-30. She noted the medications that Rosen prescribed to Covell for her mood and anxiety disorders, which included Lexapro, Klonapin, Abilify, Seroquel and Topamax, and followed Covell's progress on those drugs. R. 29-30. Beyond Rosen's assessments, the ALJ also noted Dr. Kurlander's diagnosis of "moderate depression and periodic anxiety attacks." R. 30. The ALJ reflected that, overall, the record showed no evidence of Covell needing psychiatric hospitalization or counseling services with a mental health specialist, and that she was able to manage her symptoms "somewhat successfully" with the medications prescribed by Rosen. R. 30.

The ALJ also referenced Covell's smoking and her difficulties with quitting in the opinion. The ALJ noted that "the record is [] replete with recommendations to discontinue smoking cigarettes, but [Covell] has been unable to achieve this goal in the long-term." R. 29 (citing various medical records and testimony). She also specifically noted that Covell had "return[ed] back to smoking" in 2014, R. 27, and "restarted smoking up to a pack per day" in 2015, R. 28.

Because the ALJ did not consider the GAF scores and mental status examinations in isolation, but rather in context of Covell's treatment for depression and attempts to quit smoking, the Court concludes that the ALJ did not fail appreciate the link between smoking and depression.

2. *The ALJ Used the Updated Mental Listings in Analyzing the Link Between Covell's Smoking and Depression*

Covell argues that the ALJ did not use the updated 2017 mental listings in her review of the evidence. D. 15 at 11. The updated SSA regulations went into effect on January 17, 2017 and

include a listing entitled "adapt or manage oneself."  Covell contends that her "inability to cease smoking" would fall under this newly titled category.  Id.  Covell further argues that if the ALJ had used the new listing to make her decision, she would have categorized Covell's inability to stop smoking as a "marked limitation" and presumably found her to be eligible for disability benefits as a result.  Id.

The Medical Criteria for Evaluating Mental Disorders that Covell references are used to evaluate claims involving mental disorders under Titles II and XVI of the SSA.  Paragraph B of each "mental disorder" listing describes four areas of "mental functioning" that are used to "rate the degree of [a claimant's] limitations" in the context of that mental disorder.  See 20 C.F.R. App. 1 to Subpart P, Part 404, § 12.00(E), (F).  Paragraph B4 of each listing covers the fourth area of mental functioning, which is "adapting or managing oneself."  See id. § 12.00(G)(3)(b)(iv).  The 2017 revisions to the Medical Criteria for Evaluating Mental Disorders "changed the title of this [B4] criterion to include the word 'adapt' to reflect the abilities and behaviors that [are] consider[ed] more accurately and completely."  81 FR 66157.  Paragraph B4 was also expanded to "provide[] for consideration of problems of self-regulation and impulse control."  81 FR 66141. As of January 2017, the paragraph B4 criterion of "adapt or manage oneself" is defined as:

> [an] area of mental functioning [that] refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting.  Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions.

20 C.F.R., App. 1 to Subpart P, Part 404, § 12.00(G)(3)(b)(iv).

The ALJ stated in her decision that she "considered whether the 'paragraph B' criteria [were] satisfied.  To satisfy the 'paragraph B' criteria, the mental impairments must result in at

least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." R. 24. This quote reflects the ALJ's use of the word "adapt," which appears only in the revised listings.[4]

The ALJ not only quoted the proper language but also applied the paragraph B4 criterion of "adapting or managing oneself" as codified in the 2017 listings. R. 25. In accordance with the criteria, the ALJ noted that Covell's treatment notes showed her appearance was "unremarkable" with "adequate hygiene and grooming," and that she exhibited "cooperative behavior, normal perception, normal thoughts, intact orientation [and] normal memory." R. 25, 29. The ALJ credited an August 2015 consultative examination by Dr. Komer that showed Covell "appeared well-adjusted from a psychosocial perspective." R. 25. The ALJ also pointed to Covell's ability to apply for and obtain "welfare benefits" as demonstration of her ability to adjust situationally. Id. The ALJ found that the evidence showed that Covell's limitations were consistent with "moderate limitations" under the B4 criterion. R. 25. After analyzing Covell's symptoms in accordance with paragraph B4, the ALJ decided that the Covell's impairments did not satisfy the paragraph B criteria overall because she did not have at least two "marked" limitations or one "extreme" limitation. Id. The Court concludes, therefore, that the ALJ did use the new mental listings and did not apply them improperly, either with respect to Covell's inability to stop smoking or otherwise. The Court also notes even if the ALJ had concluded Covell's inability to stop smoking was a "marked" limitation (rather than a moderate one) in her ability to "adapt or manage"

---

[4] The ALJ also used other language consistent with the 2017 revised listings. For example, she used the word "or" rather than "and," as in: "understanding, remembering, or applying information" and "concentrating, persisting, or maintaining pace." R. 24 (emphases added). The change from "and" to "or" occurred due to the 2017 revisions to the listings. See 81 FR 66157.

herself, the finding would not be enough to change the outcome of this case because the relevant listings require a finding of two marked limitations (or one extreme limitation).  See 20 C.F.R. Part 404 App. 1 §§ 12.04(B), 12.06(B).

**B.**    **The ALJ Appropriately Considered the State Agency Mental Findings**

Covell argues that the ALJ erred with respect to the state agency mental findings by (1) weighing state agency consultants' mental findings according to measurements of mental impairments from 2015 that were superseded by revised mental listings in 2017, (2) failing to distinguish between the findings of the state agency consultants Dr. Kellmer and Dr. Fischer and (3) disregarding the state agency mental findings.  D. 15 at 8.

*1.    The ALJ Did Not Err in Relying on State Agency Consultants' Evaluations Rendered Prior to the 2017 Revisions to the Mental Listings*

The state agency consultants evaluated Covell prior to the revisions to the mental disorder listings, which became effective on January 17, 2017.  See 81 FR 66138.  Covell argues that the ALJ erred by giving "great weight" to state agency consultants' assessments of Covell that were based on measurements of mental impairments from 2015 that were superseded by 2017 revised mental listings.  D. 15 at 8.

Covell asserts that the revised listings have "two entirely new sections [that] contain many more subparts (32 in total) and a new provision that a marked impairment in any one subpart affects the entire domain in which it occurs."  Id.  Covell does not explain how a reliance on the revised listings would have changed the state agency consultants' assessments or the ALJ's review of those assessments.  Covell also does not specify which subparts she believes affect her case. The issues Covell raises, however, would fall under Sections 404.1520a and 416.920, which apply to the evaluation of physical and mental impairments.  See 20 C.F.R. §§ 404.1520a, 416.920. These sections "contain guidance about the 'special technique' that [is] use[d] to evaluate the

severity of mental impairments for adults, known as the 'psychiatric review technique.'" 81 FR

66139. The special technique is a procedure used to, among other things, "consider and evaluate

functional consequences of the mental disorder(s) relevant to [a claimant's] ability to work." 20

C.F.R. § 404.1520a(a)(2). Under the technique, a claimant is evaluated on a five-point scale of

"none, mild, moderate, marked, [or] extreme" limitation in each of the broad functional areas

described in paragraph B. Id. § 404.1520a(c)(3)-(4) (referencing 20 C.F.R. App. 1 to Subpart P,

Part 404, § 12.00(E)).

Some changes were made to sections 404.1520a and 416.920 in 2017 but the revised

mental listings preserved the "special technique." Id. The changes are summarized in the Federal

Register as follows:

> we are making conforming changes to sections 404.1520a and 416.920a to be
> consistent with the final rules. In paragraphs (c) and (d) of each section, we
> removed the references to the four paragraph B criteria from our prior rules and
> replaced them with the four updated paragraph B criteria from these final rules. We
> also removed the references to the unique rating scale that only applied to paragraph
> B4 under our prior rules, 'episodes of decompensation,' because it is no longer
> necessary under the final rules.

81 FR 66160. As discussed above, the biggest substantive change to the paragraph B criteria was

the addition of "adapt or manage" oneself to the B4 criterion. The Court has already determined,

however, that this change does not compel a remand because the ALJ properly considered this

criterion. Otherwise, the 2017 revisions changed the word "or" to the word "and" for the paragraph

B1 and B3 criteria, so that they now read "understand, remember, and apply information" and

"concentrate, persist, and maintain pace." 81 FR 66144. The B2 criterion stayed largely the same,

except for the addition of the example of "keeping social interactions free of excessive irritability,

sensitivity, argumentativeness, or suspiciousness." 81 FR 66145.

In sum, there were changes to the listings, but they would have had a dispositive effect on Covell's evaluations. The Commissioner points out that under the old listings, the state agency consultants were still required to render opinions concerning Covell's ability to understand, carry out and remember simple instructions; to respond appropriately to supervision, co-workers and usual work situations and to deal with changes in a routine work setting. D. 17 at 7. The Commissioner's argument is supported by the records of the state agency consultants' evaluations, which indicate that the doctors assessed the required topics. Furthermore, as described above, the ALJ made clear in her opinion that she used the revised mental listings in reaching her decision. The Court, therefore, concludes that the ALJ did not err in relying upon the state agency medical opinions because the revised listings did not change the functional areas in which limitations are rated and the ALJ herself relied on the 2017 listings.

2.      *The ALJ Did Not Err in Her Consideration of and Reliance upon the Assessments of the State Agency Consultants*

Covell argues both that the ALJ erred by relying on two of the state agency consultants' opinions because they were inconsistent with each other and that the ALJ erred by not adopting the state agency consultants' RFCs in her decision. D. 15 at 8-9.

First, Covell argues that the ALJ erred by not distinguishing between the findings of Dr. Kellmer and Dr. Fischer. Id. Covell asserts the ALJ's reliance on these inconsistent opinions caused to the ALJ err in finding that "simple work [was] the only necessary component of a moderate restriction . . . ." D. 15 at 9. Covell also contends that the ALJ ignored Dr. Kellmer's finding that she could only focus for short periods. D. 15 at 9-10. In support of her arguments, Covell relies upon Edwards v. Barnhart, 383 F. Supp. 2d 920 (E.D. Mich. 2005). In Edwards, the court remanded an ALJ's denial of benefits because the ALJ had failed to articulate to the vocational expert in her hypothetical question that the claimant "[might] be unable to meet quotas,

stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." Id. at 930.  Covell

also cites to Cohen v. Astrue, 851 F. Supp. 2d 277 (D. Mass. 2012).  In Cohen, the Court remanded

an ALJ's decision because "the hypothetical upon which the vocational expert based her opinion

did not reflect the [ALJ's] residual functional capacity in the absence of some limitation of

concentration, persistence or pace." Id. at 286.

Covell's arguments on this point are both factually and legally unsound.  As to the facts,

the record shows that Dr. Kellmer and Dr. Fischer's evaluations of Covell were consistent across

an array of categories.[5]  The only difference between Dr. Kellmer and Dr. Fischer's evaluations

arises in their narrative explanations in two categories of moderate limitation ("socially appropriate

behavior" and "persistence or pace").  R. 79-80, 110.  For socially appropriate behavior, both

doctors concluded Covell was "not significantly limited," but Dr. Kellmer added a narrative

explanation stating:  "[Covell] periodically experiences anxiety attacks and would do best in [a]

---

[5] Both state agency consultants indicated that Covell (1) did not "have understanding and memory"
limitations, (2) did "have sustained concentration and persistence" limitations, (3) was not
significantly limited in her "ability to carry out very short and simple instructions," (4) was not
significantly limited in her "ability to carry out detailed instructions," (5) was not significantly
limited in her "ability to perform activities within a schedule, maintain regular attendance, and be
punctual within customary tolerances," (6) was not significantly limited in her "ability to work in
coordination with or in proximity to others without being distracted by them," (7) was not
significantly limited in her "ability to make simple work-related decisions," (8) did "have social
interaction limitations," (9) was not significantly limited in her "ability to ask simple questions or
request assistance," (10) was not significantly limited in her "ability to accept instructions and
respond appropriately to criticism from supervisors," (11) was not significantly limited in her
"ability to get along with coworkers or peers without distracting them or exhibiting behavioral
extremes," (12) was not significantly limited in her "ability to maintain socially appropriate
behavior and to adhere to basic standards of neatness and cleanliness" and (13) did not "have
adaptation limitations." R. 79-80, 109-110. They also both found that that Covell was moderately
limited in her (1) "ability to maintain attention and concentration for extended periods," (2) "ability
to complete a normal workday and workweek without interruptions from psychologically based
symptoms and to perform at a consistent pace without an unreasonable number and length of rest
periods" and (3) "ability to interact appropriately with the general public."  R. 79-80; 109-110.

low stress environment, and with [a] supportive supervisor." R. 80. Dr. Fischer's narrative explanation in this category stated only: "[Covell] can interact around work-related issues." R. 110. For persistence or pace, both doctors concluded Covell was "moderately limited." R. 79, 110. Dr. Kellmer added that Covell "is able to focus and concentrate on work related tasks for short periods of a normal schedule. She could have moderate impairments to sustained attention and pace due to symptoms of anxiety, or preoccupation with medical problems." R. 79. Dr. Fischer, however, noted only that Covell "can carry out instructions in a normal workday/workweek." R. 110.

Covell argues that if the ALJ had properly considered these differences and heeded Dr. Kellmer's advice that Covell needed a supportive supervisor, the ALJ would have assessed Covell's disabilities as more limiting. D. 15 at 9-10. This argument, however, is not supported by the evidence. Although there are slight differences in the explanation sections, the state agency consultants reach substantially the same conclusions about Covell's abilities. The differences in the state agency consultants' do not amount to a conflict, especially where there is almost universal agreement between their evaluations.

The Court also finds Covell's legal arguments unavailing. The Commissioner points out that the court in Cohen "did not specifically state that moderate limitations have 'corresponding limitations' in the RFC." D. 17 at 9-10 (quoting Silva v. Berryhill, 263 F. Supp. 3d 342, 351 (D. Mass. 2017)). In other words, a claimant can have moderate limitations and the ALJ could still reasonably conclude that they can perform simple work. In Cohen, the ALJ's opinion showed inconsistencies, however in this case the ALJ properly represented Covell's capacity according to the record.

Covell's second argument in this regard is that the ALJ did not use Dr. Kellmer and Dr. Fischer's RFCs and instead created her own, D. 15 at 9, based on reasoning that was "at best murky and inconsistent," id. at 10. Covell asserts that the ALJ's "deviations from the medical opinions are remandable errors." Id. Under the SSA, when an ALJ adjudicates assesses a person's functionality the "written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a(e)(4).

Contrary to Covell's claims, the record reflects that the ALJ the opinions of Dr. Kellmer and Dr. Fischer, as well as those of the other state agency consultants, in her analysis. The ALJ explained that she gave greater weight to the opinions of the state agency consultants who conducted their assessments at the reconsideration level (Dr. Fischer and Dr. McInerny) than the other state agency consultants because the consultants' evaluations at the initial level were "based upon review of only a small portion of the medical evidence and [were] inconsistent with the substantial weight of the evidence." R. 33. The ALJ noted that the state agency consultants' evaluations upon which she relied were consistent with the overall weight of the evidence in the record, and that she took Covell's moderate limitations into account in her decision. Id. The Court, therefore, rejects the argument that the ALJ did not consider the assessments of the state agency consultants in determining Covell's RFC.

C.    **The ALJ Did Not Err in Rejecting Dr. Hallowell's Medical Opinion**

Covell argues that the ALJ erred in rejecting Dr. Hallowell's medical opinion. D. 15 at 11-12. Covell contends that the ALJ (1) failed to recognize that Dr. Hallowell was a pulmonologist, (2) did not note for how long and how frequently Dr. Hallowell saw Covell and (3) erroneously

concluded that Dr. Hallowell's opinion was "inconsistent with the evidence [in the] record." D. 15 at 12-13.

Covell first argues that the ALJ erred by failing to recognize that Dr. Hallowell was a specialist (pulmonologist) because there was no mention of Dr. Hallowell's specialty in her decision. D. 15 at 12. Under the SSA regulations for claims filed before March 2017, the adjudicator "generally give[s] more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).[6] Here, the Commissioner counters Covell's argument about Dr. Hallowell's specialty by pointing out that the ALJ acknowledged Dr. Hallowell as a specialist twice in her decision. D. 17 at 21. The ALJ first recognized Dr. Hallowell as a pulmonologist when referring to Covell's October 2014 visit, stating: "On October 20, 2014, the claimant visited Robert Hallowell, M.D., a pulmonologist." R. 28. The ALJ again mentioned Dr. Hallowell's specialty later in her opinion, stating: "Dr. Hallowell, the claimant's pulmonologist, repeated examined [sic] the claimant and noted comfortable breathing." R. 29. Because the record contradicts Covell's argument that the ALJ disregarded Dr. Hallowell as a specialist, the Court concludes the ALJ did not err in this respect.

Covell's second argument regarding Dr. Hallowell is that the ALJ erred in failing to note "how long and how frequently" Dr. Hallowell saw Covell. D. 15 at 12. Usually, "the longer a treating source has treated [a claimant] and the more times [that claimant] ha[s] been seen by a treating source, the more weight [the adjudicator] will give to the source's medical opinion. When the treating source has seen [a claimant] a number of times and long enough to have obtained a

---

[6] This standard applies to claims filed before March 27, 2017. 20 C.F.R. §§ 404.1527, 416.927(c)(5); see Purdy v. Berryhill, 887 F. 3d 7, 13 (1st Cir. 2018). Covell filed her claim in 2015; thus, this standard applies to her claim.

longitudinal picture of [their] impairment, [the adjudicator] will give the medical source's medical opinion more weight than [they] would give it if it were from a nontreating source." 20 C.F.R. § 404.1527(c)(2)(i). The ALJ's decision mentions Dr. Hallowell's treatments of Covell (October 2014, December 2014, June 2015, September 2015 and December 2016). R. 28, 32. The ALJ also makes clear that her decision was not contingent upon Dr. Hallowell's specialty or the length of time he treated Covell, but rather, the inconsistency of his opinion, as discussed below. R. 28, 32. Therefore, the Court concludes that the ALJ adequately considered the length and frequency of treatment between Dr. Hallowell and Covell in her decision.

Third, Covell argues that the ALJ erred in concluding Dr. Hallowell's opinion "[was] wholly inconsistent with the evidence of record." D. 15 at 13 (quoting R. 32). Covell contends that the ALJ "incompletely analyzed Dr. Hallowell's treating source opinion, failing to determine whether . . . it should have been given deference and the greatest weight" under 20 C.F.R § 404.1527(c)(2). Id. Under the SSA, "[a] treating source opinion should be afforded controlling weight if it is well-supported by medically acceptable diagnostic techniques and consistent with other evidence in the record." Ares v. Berryhill, Civ. A. No. 16-cv-11439-IT, 2017 WL 5484674, at *4 (D. Mass. Nov. 15, 2017) (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)). If an ALJ does not afford an opinion "controlling weight," she must consider the following six factors to determine what weight to give the opinion: (1) length of the treatment relationship and frequency of the examination; 2) nature and extent of the treatment relationship; 3) support of the opinion by medical signs and laboratory findings; 4) consistency of the opinion with the record as a whole; 5) specialization of the treating source; 6) other factors that may support or contradict the medical opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). "[T]he regulations do not require an ALJ to expressly state how each factor was considered, only that the decision provide 'good reasons' for

the weight given to a treating source opinion." Bourinot, 95 F. Supp. 3d at 177 (citing 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2)); see Delafontaine v. Astrue, Civ. No. 1:10-cv-027-JL, 2011 WL 53084, at *14 (D.N.H. Jan. 7, 2011) (noting that the ALJ need not "methodically apply" each factor so long as her decision "makes it clear that these factors were properly considered").

Contrary to Covell's assertions, the ALJ detailed the evidence that was inconsistent within Dr. Hallowell's opinion. The ALJ first noted Dr. Hallowell's assessment that Covell's "symptoms would frequently interfere with her attention and concentration for simple work;" that Covell was "incapable of even low stress work;" that Covell could "walk less than one block" and that Covell would "be absent from work more than four days per month." R. 32. The ALJ then explained that she gave little weight to Dr. Hallowell's opinion because his treatment notes showed that Covell's physical examinations were benign, including comfortable breathing during each examination, which were inconsistent with his overall assessment of her disabilities. Id. Specifically, the ALJ found that Dr. Hallowell's assessment about Covell walking less than one block was inconsistent with her report to him that she exercised at the gym and was "able to walk for 30 minutes on a 5% incline at 2.8 MPH without shortness of breath." R. 579; R. 32 (citing R. 579). She also found that Dr. Hallowell's opinion was inconsistent with the "diagnostic studies showing only moderate abnormalities as well as [Covell's] treatment history, documenting improvement with treatment." R. 32. Therefore, the Court concludes that the ALJ did not err in in rejecting Dr. Hallowell's source opinion based on its inconsistencies.

## VI. Conclusion

For the foregoing reasons, the Court DENIES Covell's motions to reverse and remand, D. 15, and ALLOWS the Commissioner's motion to affirm. D. 16.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge